IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs.              ) | Crim. No. 04-159 |
| ) | |
| RODERICK LONG          ) | |

## MEMORANDUM ORDER OF COURT

Pending before the Court is Defendant's Motion to Suppress Evidence and Statements. (Docket No. 61.) The Court has considered the evidence and arguments of the parties at a hearing held September 14 and 15, 2005, and has read the briefs submitted by Defendant and the Government both prior to the hearing and in response to the Order of Court dated September 21, 2005 (Docket No. 83), directing them to file supplemental briefs addressing the testimony presented at the hearing.

A.   Motion to Suppress Defendant's Statements to the FBI

Defendant has moved to suppress verbal statements made to law enforcement officers on March 25, 2004, at his workplace, arguing that those statements were made in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution. (Post-Hearing Memorandum in Law in Support of Defendant's Omnibus Motion to Suppress Statements and Evidence with Citation of Authorities, Docket No. 89, "Def.'s Memo," at

1

14.) Defendant argues that his Sixth Amendment right to advice of counsel was violated when law enforcement officers persisted in questioning him after he requested an attorney. (Def.'s Memo at 15.) He also contends that given the totality of the circumstances, the Government has failed to prove by a preponderance of the evidence that his statements were voluntary. Inasmuch as they were involuntarily made under coercion or intimidation in violation of his Fifth Amendment right not to be compelled to testify against himself, the statements must be suppressed. (Id. at 15-16.) Mr. Long argues that because his constitutional rights were violated, "[t]he fact that [he] was informed of his rights is unavailing." (Id. at 15.)

At the suppression hearing, Mr. Long testified that during the interview at his workplace by Special Agent James Kyle of the Federal Bureau of Investigation, he was advised of his rights, including his right to an attorney, and completed an Advice of Rights Form. (Hearing Transcript, September 15, 2005, Docket No. 91, "Tr. 9/15/05," at 4-6.) He further testified that he subsequently asked for an attorney on at least two occasions during that interview, but the investigator not only persisted in questioning him after he made that request, he refused to allow Mr. Long to use the restroom or leave "until he answered their questions." (Tr. 9/15/05 at 7-8.) Defendant also testified that Agent Kyle at one point "slammed his hands down on the table,

rose up, and . . . leaned over the table and specified: 'You're not going anywhere until you answer my questions. And if you don't, I'm going to . . . make your life a living hell; and if you don't believe me, you should.'" (Tr. 9/15/05 at 8.)  As a result of this behavior by the FBI agent, Mr. Long stated that he "felt like someone punched him in the stomach" and "was very distressed."  At that point, he began answering the agent's questions.  (Id. at 8-9.)

As established in Miranda v. Arizona, 384 U.S. 436, 475 (1966), if an attorney is not present during an interrogation, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  Whether a defendant has waived his or her Fifth Amendment rights to remain silent and to counsel is to be determined from the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  North Carolina v. Butler, 441 U.S. 369, 374 (1979) (internal quotation omitted.)  Although the reviewing court must presume that the defendant did not waive his rights, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."  Butler, id. at 373.  In particular, the court should consider whether the defendant was aware of the consequences of waiving his rights.

3

Moran v. Burbine, 475 U.S. 412, 421 (1986) ("the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception . . . [and] the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.")

Here, the Court finds unpersuasive Defendant's contention that the statements made to Agent Kyle should be suppressed because they were made after he invoked his right to an attorney or that they were involuntarily made.  Mr. Long presented himself at the hearing as a competent, intelligent, well-educated person who, prior to the interview, was aware of his right to remain silent and to have counsel present during questioning.  He also acknowledged that he had completed the Advice of Rights Form and that the form had been read to him.  (Tr. 9/15/05 at 6.)  He testified that he understood at the time of the interview, based on the content of the Advice of Rights form, that "if I had a situation where I needed to have a lawyer, I could ask for a lawyer and all . . . questioning would stop."  (Id. at 17.)  This testimony is consistent with that of Agent Kyle who stated that as part of his normal interview procedure, he reads the Advice of Rights form to the interviewee and has that person read it back to him before signing the form.  (Hearing Transcript of September

4

14, 2005, Docket No. 90, "Tr. 9/14/05," at 11.)

Defendant fails to offer a credible explanation as to why, if he understood "questioning would stop" after he requested an attorney, he continued to answer Agent Kyle's questions.  We do not find credible his testimony that he was intimidated into answering questions after Agent Kyle "slapped his hands" on the table and threatened Defendant that he (Kyle) would make his life "a living hell" if he did not cooperate.

Second, Agent Kyle testified (and was not contradicted by Defendant)[1] that after the initial interview was complete, Mr. Long voluntarily continued the conversation outside the building on the sidewalk, "trying to make sure that we believed him regarding some statements he made." (Tr. 9/14/05 at 13.)

Third, Mr. Long testified that he was allowed to drive his own vehicle from his workplace to his home without a law enforcement officer with him.  (Tr. 9/15/05 at 18.)  He stated that he had a cellular phone with him during this trip but did not call an attorney.  (<u>Id.</u>)  No explanation was given as to why, if he wanted an attorney and felt intimidated by Agent Kyle's manner, he did not call an attorney when he had the opportunity to do so.  He did not provide a reasonable explanation why he did not, at a minimum, call an acquaintance who might be able to help

---

[1] Defendant testified only that when he left the building, he was asked by Agent Kyle if he were going to his home to which he replied that he was. (Tr. 9/15/05 at 18.)

5

him in this regard if he did not personally know an attorney.[2]

The Court concludes that the verbal statements made by Mr. Long to the FBI were voluntarily and knowingly made after he had been advised of his right to an attorney and to have questioning suspended should he invoke that right. His conduct in continuing the conversation on the street after there was no question he was free to leave, and his failure to contact an attorney when he had a completely unencumbered opportunity to do so belies his contention that he was so intimidated by Agent Kyle that his statements were coerced. The Motion to Suppress is therefore denied with regard to those statements.

B.   Motion to Suppress Written Statement to Ross Township Police

During the execution of a federal search warrant at Defendant's home, law enforcement officers found marijuana and related paraphernalia, as well as a firearm in a bedroom closet

---

[2] Although Mr. Long also made statements to law enforcement officers at his home in Ross Township after he was interviewed at work, and argues that they be suppressed as well (Def.'s Memo at 15), he concedes that he did not ask for an attorney during that round of questioning. (Tr. 9/15/05 at 11-12.) He also testified that he understood he was not under arrest when he spoke to the officers at his home and felt free to go to a neighbor's house or get back in his car. (Id. at 11-12; 19.)
Agent Kyle testified that when he and Mr. Long separately arrived at Defendant's home, Mr. Long approached him to continue the discussion begun at his workplace. (Tr. 9/14/05 at 14.) He further stated that before they began that discussion, "I reminded him of his rights at that point because there had been a break in our conversation. I reminded him that, you know, anything he said would be used and went back through the rights orally." (Id.) Mr. Long did not contradict this testimony.

(discussed in more detail below) which was later determined to be stolen. At approximately 8 p.m. on March 24, 2005, Mr. Long was arrested by Ross Township Police, taken to the police station, and charged with possession of the marijuana, possession with intent to deliver, and receiving stolen property.

Defendant argues that a written statement he made to the Ross Township Police should be suppressed because it was elicited after his request for an attorney was denied. According to Mr. Long, he was told by police officers after he asked for an attorney that if he "waste[d] any time," his wife and older step-son would be arrested for possession of the marijuana. Defendant testified that he signed the statement acknowledging that the marijuana and firearm belonged to him because he was afraid not only that his wife and older step-son would be arrested, but that his younger step-son would be placed in child services protection. (Tr. 9/15/05 at 14-15.)

At the hearing, Mr. Long acknowledged that he had been given his <u>Miranda</u> rights by the police after he was arrested. (Tr. 9/15/05 at 20; see also Government Exhibit 3 and testimony of Ross Township Detective William Barrett, Tr. 9/14/05 at 61, confirming this statement.) Defendant also testified that the document in which he acknowledged owning the marijuana and firearm included the following language at the top of the form:

> I have been advised and duly warned by Detective
> Barrett and Detective LaMonica, who has [sic]

> identified themselves as police officers, of my rights to advice of counsel before making any statements, that I do not have to make any statements at all, nor incriminate myself in any manner.
>
> I hereby expressly waive my right to advice of counsel and voluntarily make the following statements to aforesaid person[s], knowing that any statement I make may be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made.
>
> I declare that the following statement is made of my own free will without promise of hope or reward, without fear or threat or physical harm, without coercion, favor, . . . or offer of favor, without leniency or offer of leniency by any person or persons whomsoever.

(Tr. 9/15/05 at 21; *see also* Government Exhibit 4.)

Although he testified that he did not remember if this form had been read to him or if he had read it himself before he signed it, he provided no credible testimony which would reconcile the signed waiver of his right to counsel with his current position that the written statement should be suppressed because he was denied that right. Nor did he provide credible testimony which would reconcile his written declaration that his statements were made "voluntarily" and "without coercion" with his current argument that he made those statements to protect his family. The Motion to Suppress the statements given to Ross Township Police on March 25, 2004, is therefore denied.

C.  <u>Motion to Suppress Evidence of Stolen Firearm</u>

The warrant issued for search of Defendant's home authorized

8

agents to search for child pornography and computer-related equipment, but did not explicitly allow a search for firearms. During the search, officers discovered a 9 mm handgun, subsequently identified as having been stolen. Mr. Long was charged with possession of a stolen firearm in both state and federal court. He now contends that the evidence of that stolen firearm should be suppressed because it was outside the scope of the authorized warrant and its search and seizure violated his rights under the Fourth Amendment to the Constitution. (Def.'s Memo at 6.) Moreover, he argues, neither the plain view exception nor the consent exception to the warrant requirement applies in this case, contrary to the position of the Government. (Id. at 6 and 11; see also Government's Response to Defendant's Supplemental Brief, Docket No. 92, "Gov't. Resp.," at 3 and 7.)

According to the testimony of FBI Agent Paul Vitchock, Pennsylvania State troopers, Ross Township Police, a United States Postal Inspector, and FBI agents arrived at the Long residence on March 25, 2004, at approximately 4:00 p.m.; neither Mr. Long nor his wife was home at the time. (Tr. 9/14/05 at 37.) Detective Barrett was among the group of officers who explained to Mrs. Long's teenage sons that they were there to execute a search warrant. At approximately 4:15 p.m, the officers, including Agent Vitchock, began a protective sweep of the two-story house, searching for weapons and persons who might have

access to those weapons.  (Id. at 50.)

Agent Vitchock was assigned to search the master bedroom on the second floor.  Inside a "short closet," he discovered two long guns and a canvas duffle bag.  Inside the duffle bag was a smaller bag made of plastic or paper, and inside that bag, Agent Vitchock discovered a 9 mm handgun.  He removed the guns from the closet, checked to see if they were loaded, and left them on the bed or floor where they could be readily seen by anyone entering the room.  He noted the serial numbers on each of the firearms and asked Ross Township Police officers to run the serial numbers on all of them. (Tr. 9/14/05 at 40-46.)  The check of the serial numbers disclosed that the 9 mm handgun had been stolen. (Testimony of Ross Township Detective Randy McAllister, Tr. 9/14/05 at 54.)

Agent Vitchock testified that he believed Mrs. Long arrived home before he began his search of the bedroom, that is, by about 4:15 p.m.  (Tr. 9/14/05 at 49.)  No one testified as to the precise time the marijuana was found in the first floor office used by Defendant.  Detective Barrett from the Ross Township Police testified that when the marijuana was found, he was notified.  He then approached Mrs. Long at approximately 5:07 p.m. to ask for her consent to search for "drugs – controlled substances – illegal contraband including but not limited to marijuana and paraphernalia.  Any other illegal items."  (Tr.

10

9/14/05 at 67-68; *see also* Government Exhibit 2.)  He testified that Mrs. Long signed the consent form at 5:15 p.m., stating that as she did so, "she said certainly; anything in there that's illegal, she doesn't want in the house."  (Tr. 9/14/05 at 69.)

Mr. Long argues that Agent Vitchock - an experienced police officer who admitted owning a handgun and having patted down suspects to assure they were not armed -- should have recognized by touch that the bag inside the duffle bag contained an handgun and ceased his search.  (Def.'s Memo at 7-9.)  Even if one accepts Mr. Vitchock's testimony that there was a possibility something else could have been in the bag, Defendant argues, once he looked inside and saw only the gun, he should not have removed it from the bag, much less recorded and investigated the serial number because there was nothing to immediately indicate the criminal nature of that particular firearm.  (Id. at 8-9.)  Therefore, the plain view exception to the warrantless search doctrine is not applicable and the search violated his Fourth Amendment right to be free of unreasonable search and seizure.

Alternatively, Defendant argues, the consent exception to the warrant requirement does not apply because the Government did not establish by a preponderance of the evidence at the hearing that Mrs. Long could consent to the search of the closet, bag, inner bag or gun; that her consent was freely and voluntarily given; or that the consent was obtained prior to discovery of the

firearm.  (Def.'s Memo at 11-14.)  Because we conclude that Mrs. Long had authority to consent to the search and that the consent was voluntarily and timely given, we need not consider the applicability of the plain view exception.

While the Fourth Amendment generally prohibits warrantless searches, a search following a valid consent by one with actual or apparent authority to agree to that search is "reasonable" under the Fourth Amendment; therefore a warrant is not required. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("there is nothing constitutionally suspect in a person's voluntarily allowing a search. The actual conduct of the search may be precisely the same as if the police had obtained a warrant.") The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent.  United States v. Matlock, 415 U.S. 164, 177 (1974).

The preliminary question here is whether Defendant's wife, Elizabeth Long, had authority to consent to the search of the entire house, including the closet, the duffle bag and the bag containing the gun.  As the U.S. Supreme Court pointed out in Matlock,

> the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared. . . . [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common

12

>  authority over or other sufficient relationship to the
>  premises or effects sought to be inspected.

Matlock, id. at 171(internal citations omitted).

>  Authority to consent to a search arises from
>
>  mutual use of the property by persons generally having
>  joint access or control for most purposes, so that it
>  is reasonable to recognize that any of the
>  co-inhabitants has the right to permit the inspection
>  in his own right and that the others have assumed the
>  risk that one of their number might permit the common
>  area to be searched.

Id. at 171, n7.

The argument that Mrs. Long did not have authority to consent to the search of the closet, bag, inner bag or gun is quickly dismissed. Defendant argues that by placing the handgun in a bag within a bag within a closet, he "demonstrated an expectation of privacy in those containers and with respect to the gun, and his wife had no authority to consent to search the container or the gun itself." (Def.'s Memo at 11-12.) This argument might be persuasive if it were based on *any* evidence that the duffle bag belonged solely to Mr. Long, that he placed it in the closet, that only he had access to the closet, or that Mrs. Long was not a co-inhabitant of the premises where the bag was located. Mr. Long did not offer any testimony about the ownership of the gun or who placed it in the closet and bags. The bag was located in the master bedroom of the house Defendant's wife occupied, leading to the conclusion that her consent to search the house for illegal objects encompassed that

13

space as well as any other. This situation is thus readily distinguishable from the cases relied upon by Defendant, i.e., United States v. Fultz, 146 F.3d 1102 (9th Cir. 1998), where the person who consented to the search was only a friend with no mutual interest in the defendant's closed containers, and United States v. Davis, 332 F.3d 1163 (9th Cir. 2003), in which an apartment lessee had no mutual use and joint access or control over a gymbag, belonging to the defendant, found under her roommate's bed, and thus could not legally consent to a search of the bag.[3]

Second, Defendant argues that Mrs. Long's consent was not freely and voluntarily given and no more than "a mere acquiescence to legal authority." (Def.'s Memo at 12-13.) The voluntariness of a consent must be judged in the light of the totality of the circumstances. Schneckloth, 412 U.S. at 227. Here, again, the testimony of the officers participating in the search of the Long residence was uncontradicted by Defendant or

---

[3] The third case cited by Defendant, United States v. Young, 350 F.3d 1302 (11th Cir. 2003), is inapposite to his argument that Mrs. Long did not have authority to consent to the search of the closet and bags. In Young, the defendant sought to suppress evidence used to convict him for various internal revenue tax evasion schemes. Young sent cash via Federal Express, despite its written warnings that sending cash was illegal, and that FedEx retained the right to inspect any package for any reason. As part of an IRS investigation, FedEx turned over 14 packages addressed to Young which were x-rayed and found to contain large amounts of cash. The district court held that Young had given up his expectation of privacy in the packages when he was warned by FedEx as stated above, a conclusion which was affirmed on appeal. Id., 350 F.3d 1303-05, 1308. We fail to understand how Young supports any element of Defendant's argument.

his wife.

    Detective Barrett testified that when he advised Mrs. Long that marijuana had been found in the house, he explained that the officers "were interested in searching for other drugs and other illegal items and . . . we could get a search warrant, would she give consent."  (Tr. 9/14/05 at 68.)  Mr. Barrett also testified that he "may have" said they could get a search warrant and did not "recall if [he] said 'or we could get a search warrant.'" (Id. at 69.)  Defendant contends these "backpedaling" statements give rise to an implication "at the very least," that Mrs. Long would have believed refusing to give consent would be futile, particularly since the marijuana had already been found.  (Def.'s Memo at 13.)  In the absence of any evidence to support this argument, or to contradict Detective Barrett's statement that Mrs. Long was "very cooperative" when asked to give consent to the expanded search, the Court finds this argument entirely speculative.

    Moreover, we agree with the court in United States v. Faruolo, 506 F.2d 490, 495 (2d Cir. 1974), that "the well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion [and] is an admission by the officer that he has no right to proceed unless the defendant consents." (See also cases cited by Faruolo.)  No evidence was offered which would make the

circumstances here analogous to those cases in which officers imply that obtaining a search warrant is a mere formality or intimate that the occupants of the premises to be searched will be kept under surveillance until the warrant is obtained. Nor is this a case like <u>United States v. Sebetich</u>, 776 F.2d 412, 425 (3d Cir. 1985), where the court noted that had the investigating officer implied to the homeowner that getting a warrant was a foregone conclusion, thus conveying the impression that there was no choice but to consent,[4] one could conclude that the consent was not voluntarily given, or like <u>United States v. Tovar-Rico</u>, 61 F.3d 1529, 1536 (11th Cir. 1995), where the person giving consent to the search was confronted by armed officers, agreed to the search only after a protective sweep had been concluded, and "did not know what was going on."

Finally, Defendant argues that the stolen handgun was discovered before consent for the expanded search was given and thus should be suppressed. (Def.'s Memo at 13-14.) The consent form indicates that Mrs. Long signed it at Detective Barrett's request at 5:15 p.m. (Tr. 9/14/05 at 58-59, 67-69, and Government Exhibit 2.) Agent Vitchock testified that it "did not seem like a particularly long period" between the time he

---

[4] This analysis by the Court of Appeals continues, "On the other hand, if the district court found that [the officer] clearly indicated to [the homeowner] that, absent consent, he would only seek to obtain a warrant, and that a magistrate would first have to determine that probable cause existed, such a finding would not militate at all against a finding of voluntary consent." <u>Sebetich</u>, 776 F.2d at 425.

16

discovered the three guns and when he asked a Ross Township police officer to run the serial numbers to ascertain their ownership. (Tr. 9/14/05 at 34-35.) Detective McAllister testified that according to his notes, he called the serial numbers into the dispatch center to be checked at 5:51 p.m. (Id. at 57.) Defendant speculates that the guns were discovered "at the outset of the search," during the protective sweep which began shortly after 4 p.m., i.e., prior to the time at which Mrs. Long signed the consent form (Def.'s Memo at 13), but no document or testimony was produced at the hearing to support this argument. In the absence of any evidence to the contrary, it is not unreasonable to conclude from the chronology outlined by Messrs. Barrett, Vitchock and McAllister that discovery of the handgun occurred after Mrs. Long had given permission for the expanded search.

Finally, Defendant relies on Arizona v. Hicks, 480 U.S. 321 (1987) to support his argument that the subsequent investigation of the serial numbers on the three guns found in the closet violates the Fourth Amendment because "no exigent circumstances justify examining the gun for a serial number and then running that serial number." (Def.'s Memo at 8-9 and footnote 1.) The facts of Hicks are well-known and will not be reiterated here. Suffice it to say that the Hicks Court explicitly agreed with the government that had the serial numbers on the stereo equipment

17

been legally acquired, e.g., through the plain view exception to the warrantless search doctrine, "the mere recording of the serial numbers [would] not constitute a seizure." Hicks, 480 U.S. at 325.

As the Government points out, investigating the serial numbers on weapons which have come lawfully into the possession of investigators does not constitute a search or seizure in violation of the Fourth Amendment. (Gov't. Resp. at 4, also relying on Hicks.) Once Mrs. Long gave valid consent to the search for "other illegal items," Agent Vitchock's notation of the serial numbers of weapons discovered was entirely lawful. Agent Vitchock testified that when weapons are discovered, "we typically run the serial number to establish ownership and/or any other issues with the weapon," such as determining if it were stolen. He stated that this was the "typical" practice whether firearms are included in scope of the search warrant and whether consent to search for weapons has been given. (Tr. 9/14/05 at 35; 50-51.)

As the court noted in United States v. Watts, 7 F.3d 122, 127 (8th Cir. 1993), *cert. denied*, 510 U.S. 1078 (1994), once police officers come into legal possession of such numbers, they have an affirmative duty to use the least intrusive methods reasonably available to confirm or dispel their suspicions of criminal behavior. Determining if a gun is stolen is quickly and

18

unintrusively accomplished by comparing its serial number against a computerized database. See <u>United States v. Wallace</u>, 889 F.2d 580, 583 (5th Cir. 1989), *cert. denied*, 497 U.S. 1006 (1990), holding that the police having "legally come into possession of the gun . . . were entitled, if not expected, to note and to record its serial number."

In light of the evidence presented at the hearing and the arguments of the parties in their initial and supplemental briefs, the Court concludes that Defendant's motion to suppress evidence concerning the 9 mm handgun should be denied.

**AND NOW**, this _27th_ day of October, 2005, it is hereby ORDERED that Defendant's motion to suppress statements and evidence, now pending at Docket No. 61, is denied in its entirety.

_____
William L. Standish
U.S. District Judge

cc:  Linda E. J. Cohn, Esq.
     Federal Public Defender's Office
     1001 Liberty Avenue
     1450 Liberty Center
     Pittsburgh, PA   15222-3716
     email: linda_cohn@fd.org

     Tina O. Miller, Esq.
     United States Attorney's Office
     700 Grant Street
     Suite 400
     Pittsburgh, PA 15219
     email: tina.o.miller@usdoj.gov